**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | | |
|---|---|---|
| BARRY JUNIOR SOWDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:24-cv-00001-TWP-KMB |
| | ) | |
| ANDY BYRNE,<br>MIKE ISOM Officer,<br>KELLEY BROWN, | )<br>)<br>) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment (Dkt. 51) filed by Defendants Andy Byrne ("Corporal Byrne"), Mike Isom ("Officer Isom"), and Kelly Brown ("Sergeant Brown") (collectively, "Defendants") of the New Albany Police Department. *Pro se* Plaintiff Barry Junior Sowders ("Sowders") initiated this action by filing a Complaint alleging the Defendants used excessive force in violation of his Constitutional rights while effectuating his arrest, causing him personal injuries and damages (Dkt. 1). Defendants seek summary judgment on the grounds that they responded in an objectively reasonable manner to the threat presented by Sowders and that they are entitled to qualified immunity. For the reasons discussed below, Defendants' Motion is **granted**.

## I. BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Sowders as the nonmoving party. *See Zerante v. DeLuca,* 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). However, the Court need not credit assertions that are contradicted by

the record. *See Palmer v. Franz*, 928 F.3d 560, 563 (7th Cir. 2019) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." (cleaned up)).

**A. <u>Factual Background</u>**

On May 30, 2023, the New Albany Police Department received a 911 call from Sowders' neighbor reporting a shooting and potential domestic dispute on Green Street in New Albany, Indiana (Dkt. 54-1 at 1). The caller identified the perpetrator as "Barry" (Dkt. 55 (Notice of Manual Filing) Ex. 1 at 3:25–33). New Albany Police Department officers, including Corporal Byrne and Sergeant Brown traveled to the address of the residence on Green Street provided by dispatch (Dkt. 54-10 at 1–2). Upon arrival, Corporal Byrne detected a strong odor of marijuana and found a shell casing in the front yard of the home. Corporal Byrne then traveled to the courthouse to obtain a search warrant for the home.

While at the scene, dispatch advised Corporal Byrne that the alleged victim, Kayla Toman ("Toman"), had arrived at the New Albany Police Department station reporting that her ex-boyfriend, Sowders, had shot at her vehicle on Green Street. *Id.* at 2. Sergeant Brown interviewed Toman who told him that Sowders had become upset with her because she did not wish to continue their relationship (Dkt. 55 Ex. 6 at 2:45–4:00, 16:00–17:00). Toman reported that when she arrived home that day, Sowders was sitting on the couch holding a black pistol. Sowders then cornered Toman with the firearm and threatened to kill both himself and Toman. She reported that she began having a panic attack and asked to walk outside because she could not breathe. Toman walked to her car and Sowders followed her, not allowing her to leave without him. *Id.* at 18:00–21:00. Sowders told Toman that if she ran or screamed, he would shoot and kill her. *Id.* at 20:00–20:20.

Toman convinced Sowders that if he put the gun away, he could get in the car and go with her. *Id.* at 20:50–21:00. Toman unlocked only her driver's side door of the car, entered, and tried to drive away before Sowders stepped in front of the car on the driver's side and pointed the gun at her through the windshield. *Id.* at 21:00–22:00. As Toman sped off, Sowders shot at her, striking the passenger door on the driver's side of her vehicle (*See* Dkt. 54-3).

While interviewing Toman, Sergeant Brown was advised that a vehicle matching the description of Sowders' maroon Ford Fusion was spotted in an alley near Sowders' father's home on Grant Street (Dkt. 54-1 at 2). Sergeant Brown informed Corporal Byrne that Sowders' vehicle had been spotted near Grant Street, and Corporal Byrne and Sergeant Brown traveled to the location. *Id.*; (Dkt. 54-10 at 2). That day, Sergeant Brown and Officer Isom were armed with handguns and Corporal Byrne was armed with a Colt Model M16 5.56-millimeter rifle with a suppressor. (*See* Dkt. 54-1 at 3, Dkt.54-4 at 2, Dkt. 54-10 at ).

When Sergeant Brown arrived on the scene, he observed Sowders' Ford Fusion facing south at the rear of 1412 Grant Street. Believing Sowders to be dangerous, Sergeant Brown called for backup (Dkt. 54-1 at 2). Sergeant Brown witnessed Sowders exit his vehicle and observed a black handgun protruding from his shorts. *Id.* Sergeant Brown exited his vehicle with his handgun drawn, pointed it at Sowders, and ordered him to the ground. *Id.* Sowders failed to comply with the orders and instead yelled, "What did I do? I didn't fucking do nothing." *Id.* Sowders then took off running through the nearby backyards. Sergeant Brown testified that he did not discharge his firearm at any time during the incident. *Id.* at 3.

**B. <u>Sowders' Testimony</u>**

Sowders concedes that he shot at Toman's vehicle and then went to his father's house on Grant Street where he smoked marijuana to try to calm his nerves (Dkt. 54-5 at 35:6–20).[1] He was also under the influence of Xanax. *Id.* Sowders became paranoid after seeing a police vehicle pass by, so he moved his vehicle into a parking space near the alley to conceal his license plate. *Id.* at 36:4–37:3. While moving the vehicle, an unmarked Ford Edge pulled in the alley, blocking Sowders' car. Sowders observed Sergeant Brown (in uniform) exit the unmarked vehicle and point his firearm at Sowders. *Id.* at 37:1–24. Sergeant Brown repeatedly told Sowders to "get on the fucking ground." *Id.* Sowders did not comply with Sergeant Brown's orders to get on the ground because he was carrying his Glock 23 firearm in his right pocket. *Id.* at 48:18–49:16. Sowders remembers saying "What the fuck, I didn't do nothing?" and then he heard something to his right (Dkt. 59-1 at 57). He did not see Officer Isom approach (Dkt. 54-5 at 50:11–22). But he knew the police were at the scene because "he messed up" and knew he had done something wrong by shooting at Toman's vehicle, so there was a possibility that the police would be looking for him. *Id.* at 51:9–20. Sowders knew that he should have gotten on the ground when Sergeant Brown ordered him to do so. *Id.* at 54:20–55:2.

Sowders testified that after he took off running, officers began shooting as soon as he turned, hitting him once in his left shoulder. He believes one or two officers shot at him, but did not see. He kept running until he cut around the first corner of a house, and he never turned around or stopped until he heard "I hit him with an AR." *Id.* at 56:5–6. Sowders was not aware of being hit, but later became aware that he had been shot three times, including once in his left shoulder. *Id.* at 55:16–58:7.

---

[1] When citing deposition transcripts, the Court refers to deposition page numbers and not ECF page numbers.

Ring camera footage from a nearby residence captured the initial moments of the pursuit. The video first shows Officer Isom running as he exits the video footage, followed by Corporal Byrne, armed with his rifle, followed by Seargent Brown, who was initially holstering his weapon but then pulled it back out (Dkt. 55 Ex. 6). The Ring video footage does not show the shooting, but the audio can be heard. *Id.* The first gun shots heard were five loud, unsuppressed shots. *Id.* Immediately after, the video's audio captures approximately ten suppressed shots. *Id.*

When shown the Ring camera video during his deposition, Sowders' recollection was refreshed, and he testified that the officers began firing shots at him when he passed the apartment stairs near 1407 East Market Street after running (Dkt. 54-5 at 58:9–59:13). Sowders agrees that the first five shots heard—loud shots— came from a handgun, which had to be either his or Officer Isom's firearm, and then, the second round of suppressed shots came from Corporal Byrne's rifle. *Id.* at 70:10–71:23, 75:13–16.

At his deposition, Sowders testified that after he was around the corner and noticed that he had been shot, he pulled his gun from his pocket, popped back out around the corner towards the officers, and shot Corporal Byrne. *Id.* at 75:13–76:22. He testified that he only fired his weapon twice, and that once he fired at the officers, no further gunfire was exchanged between him and the officers. *Id.* The wound in Sowders' shoulder was a front-side entrance wound which exited out the rear of his shoulder. *Id.* at 55:16–56:12.

After shooting Corporal Byrne, Sowders continued to run from the officers toward Market Street. He denies encountering or ever shooting at Sergeant Brown, though he could not explain why a shell casing was found in the middle of Market Street. *Id.* at 97:6–24. After his arrest, Sowders pled guilty to two counts of attempted murder for his crimes against Toman and Corporal Byrne (Dkt. 54-2 at 6:1–6; 175:13–176:25).

### C. <u>Defendants' Version</u>

Sergeant Brown attests that he witnessed Sowders' Ford Fusion begin to move, at which point he advised Officer Isom that the vehicle was going mobile (Dkt. 54-1 at 2). Sergeant Brown and Officer Isom approached Sowders' vehicle from both sides of the alley with their police vehicles' lights activated. Sowders then executed a three-point turn and backed into a yard of a house on Market Street with his vehicle facing north. Sergeant Brown witnessed Sowders exit the vehicle with a black handgun protruding from his shorts. *Id.*

Sergeant Brown exited his vehicle with his service weapon drawn and ordered Sowders to the ground. *Id.* Sowders then yelled some variation of "what did I do, I didn't do nothing." *Id.*; (Dkt. 54-4 at 2). Officer Isom then exited his vehicle with his service weapon drawn (Dkt. 54-4 at 2). By this time, Officer Isom had received information through dispatch that Sowders was armed and was suspected of attempted murder, causing Officer Isom to believe that Sowders was suicidal, homicidal, and dangerous. *Id.* Sergeant Brown also believed that his life, the lives of other officers, and the members of the community were in imminent danger as he believed that Sowders was homicidal, suicidal, armed, and dangerous (Dkt. 54-1 at 2–3).

Corporal Byrne arrived at the scene as this initial encounter with Sowders was taking place (Dkt. 54-10 at 2). Corporal Byrne observed Sergeant Brown's vehicle block Sowders into the driveway he had backed into. Corporal Byrne exited his vehicle armed with his Colt Model M16 5.56-millimeter rifle with a suppressor. *Id.* As Corporal Byrne reached Sergeant Brown's vehicle, Sowders took off running through the nearby backyards, heading towards Market Street. *Id.* Sergeant Brown announced to the other officers that Sowders had a gun in his pocket. Officer Isom and Corporal Byrne chased after Sowders while Sergeant Brown ran around the area to attempt to flank Sowders (Dkt. 54-1 at 3).

Corporal Byrne, followed by Officer Isom, began pursuing Sowders. As they were chasing him, Sowders rounded the corner of 1405 East Market Street. However, as Corporal Byrne approached the corner, Sowders re-emerged from the corner and fired multiple shots at Corporal Byrne, striking him in the femoral nerve causing him to lose feeling in his leg and fall to the ground (Dkt. 54-10 at 3). While on the ground, Corporal Byrne returned fire, and, when Sowders retreated behind the corner of 1405 East Market Street, Corporal Byrne fired rounds through the corner of the home where he estimated Sowders to be. After firing for one to two seconds, Corporal Byrne ceased fire. *Id.*

Corporal Byrne advised that he had been hit, so Officer Isom rendered aid and terminated his involvement in the pursuit. Officer Isom did not fire his weapon, though Sowders disputes this fact (Dkt. 54-4 at 3).

Sergeant Brown was attempting a flanking maneuver when he heard gunshots that sounded like a handgun, followed by a second round of shots that sounded like they came from Corporal Byrne's suppressed weapon (Dkt. 54-1 at 3). As Sergeant Brown approached the front of the homes between 1407 and 1409 East Market Street, he observed Sowders running across Market Street. Sergeant Brown then drew his service weapon, pointed it at Sowders, and ordered him to stop and get on the ground. Sowders instead turned toward Sergeant Brown and fired a gunshot in his direction, striking a home near Sergeant Brown. *Id.* Sergeant Brown took cover and witnessed Sowders run behind other homes across the street. Sergeant Brown contends that he did not fire his weapon at any point during the incident. *Id.*

**D. <u>Indiana State Police Investigation</u>**

After the shooting, the matter was turned over to the Indiana State Police for investigation (Dkt. 54-1 at 3–4). Detective Dave Mitchell ("Detective Mitchell") of the Indiana State Police

arrived at the scene at approximately 12:25 p.m. on the day of the shooting (Dkt. 54-7 at 1). Detective Mitchell and Lead Investigator, Detective Mike Bennett ("Detective Bennett"), conducted an ammunition count for both Sergeant Brown's and Officer Isom's firearms. *Id.* at 2. They determined that neither handgun had missing rounds. *Id.*

The Indiana State Police also received a lab analysis report from the Evansville Regional Laboratory (the "Forensic Report"), which was prepared by a Forensic Scientist of the Firearms Unit (*see* Dkt. 54-9). The Forensic Report determined there were seven total 40 caliber shell casings recovered at the scene. All seven spent shell casings were identified as having been fired from the Glock, Model 23, 40 S&W semiautomatic pistol, serial number BYDG435, that Sowders had in his possession. *Id.* at 4.

## II. <u>LEGAL STANDARD</u>

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation modified). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest

on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "Neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations modified).

## III. DISCUSSION

In his Complaint, Sowders alleges Defendants used "unreasonable and excessive force in violation of his Fourth and Fourteenth Amendment rights while conducting his arrest with actual intent to cause injury" (Dkt. 1 at 3). He checks the box that he is bringing claims under 42 U.S.C. § 1983. *Id.*

As an initial matter, Sowders' Fourteenth Amendment claims must be dismissed. The Supreme Court in *Graham v. Connor* held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U.S. 386, 395 (1989) (emphasis in original). Sowders' claims are precisely the type that the Supreme Court held should be analyzed

under the Fourth Amendment. He alleges that the Defendants each, as law enforcement officers, used excessive force by shooting him in attempting to effect his arrest. Accordingly, Sowders' claims must be analyzed under the Fourth Amendment. The Defendants agree with this determination (Dkt. 53 at 14), and Sowders does not contest dismissing these claims. Accordingly, Sowders' Fourteenth Amendment claims are **dismissed with prejudice**.

Turning to Sowders' Fourth Amendment claims, the Defendants contend that the Court should grant summary judgment in their favor for two reasons: (1) Sowders' claims fail as a matter of law; and (2) the Defendants are entitled to qualified immunity (*see* Dkt. 53). The Court will address the Defendants' arguments in turn.

## A. <u>Excessive Force Standards</u>

"Although police officers may use force to seize another person under appropriate circumstances, the Fourth Amendment protects against the use of excessive force." *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021). "The question whether a particular use of force has crossed the constitutional line is governed by the Fourth Amendment, which prohibits unreasonable seizures." *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015). Courts analyze excessive force cases under an objective reasonableness standard. *Graham*, 490 U.S. at 395.

The Fourth Amendment's "reasonableness" test is "not capable of precise definition or mechanical application." *Id.* at 396 (citation omitted). "'[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Taylor*, 10 F.4th at 806 (quoting *Graham*, 490 U.S. at 397) (alteration in original). "Such an analysis is inherently fact-dependent, requiring consideration of such factors as the severity of the crime at issue, whether the person posed an immediate threat to the safety of the officers or others, and whether the person was actively

resisting the officers." *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 472–473 (7th Cir. 2015) (citing *Graham*, 490 U.S. at 396). "Whether a particular use of force was objectively reasonable 'is a legal determination rather than a pure question of fact for the jury to decide.'" *Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018) (quoting *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012)). To avoid summary judgment, the record must allow a reasonable jury to conclude that the individual Defendants used excessive force against him.

The Defendants discuss the excessive force claims against each of the Defendants separately, and the Court will do the same.

**1. <u>Sergeant Brown</u>**

The Defendants first argue that Sowders' excessive force claim against Sergeant Brown fails as a matter of law because Sowders' own testimony confirms that Sergeant Brown did not fire his weapon (Dkt. 53 at 14). Sowders responds that "the only two who had handguns were [Officer] Isom and [Sergeant] Brown. So by facts of circumstantial [*sic*] one of these officers shot [him]." (Dkt. 59 at 2). The Court agrees with the Defendants.

Sowders testified in his deposition that Sergeant Brown was not involved in the gunfire exchange and did not fire his weapon. Specifically, when Sowders was explaining where his father, who followed behind Sergeant Brown, and Sergeant Brown were during the shooting, he stated "neither one of them was aware of anybody firing. They didn't know who was firing what. They hear gunshots obviously, I'm sure, but they wasn't aware of anything." (Dkt. 54-5 at 108:15–18). Sowders then continued that "the only one that's aware of it, of the gunfire and stuff is Isom and Byrne[]." *Id.* at 108:20–21.

For obvious reasons, the mere fact that Sergeant Brown had a handgun does not indicate that he shot Sowders or used any force against Sowders, especially considering Sowders' own

testimony, and the testimony of all officers involved, that Sergeant Brown never fired his weapon and ran around Market Street to attempt to flank Sowders. The uncontroverted evidence shows that Sergeant Brown was not involved in the gunfire exchange, which Sowders himself confirmed.

Based on the designated evidence, a reasonable jury could not find that Sergeant Brown used excessive force in Sowders' arrest. Summary judgment is **granted** as to Sergeant Brown.

**2. <u>Officer Isom</u>**

The Defendants contend that Sowders' claim against Officer Isom must be dismissed, as the undisputed evidence shows that Officer Isom neither fired his weapon nor used force against Sowders at any time during the incident (Dkt. 53 at 15). The Defendants point out that while Sowders asserts that he was shot in his left shoulder by either Officer Isom or Sergeant Brown while standing at his vehicle as he turned to run, Sowders conceded that no shots were fired in that location after being shown the video footage from the Ring camera. Defendants note that after being shown the video footage, Sowders changed his story and testified that the shots were actually fired when he passed the apartment steps of 1407 East Market Street, and those shots continued until after he rounded the corner of 1405 East Market Street.

Defendants further point out that Sowders testified it was not until after he rounded the corner at 1405 East Market Street that he heard an officer announce they "got him with an AR," at which point Sowders realized he had been shot several times and then emerged from around the corner and fired twice at Corporal Byrne. *Id.* at 15–16.

Defendants argue that Sowders' testimony is wholly dispelled by the undisputed record evidence. It is undisputed that no shots were fired while the officers were near Sowders' vehicle. The ring footage conclusively establishes that Sowders had not been shot at the time he ran from his vehicle to the nearby yard. Rather, the audio demonstrates that within three seconds of the

officers exiting the frame, five loud shots were fired. And Sowders acknowledged the shots were from a handgun which he testified could have only been fired from Officer Isom's firearm or Sowders' own firearm. *Id.* at 16.

The Defendants continue that Officer Isom testified that he did not fire his weapon, and Sowders never witnessed Officer Isom fire his weapon nor has he put forth any evidence to the contrary. Further, the investigation performed by the Indiana State Police confirms that Officer Isom never fired his weapon: Detectives Bennett and Mitchell performed an ammunition check on Officer Isom's weapon and determined that it was not missing ammunition. In addition, the Forensic Report matched all seven 40 caliber shell casings found at the scene to Sowders' weapon.

The Defendants argue that Sowders is adamant that he never faced the direction of the officers while running but nonetheless agrees that the gunshot wound to his left shoulder was a front/side entrance wound. The Defendants assert that physics simply cannot support such a theory, and conclusory allegations alone cannot defeat a motion for summary judgment. *Id.* at 17.

In response, relying on "the forensics," Sowders argues it is undisputed that he was shot by both a rifle and a handgun (Dkt. 59 at 3). However, the Clinical Forensic Medicine Consultation report he cites does not provide any opinion as to the caliber of the bullet Sowders was shot with. Rather, the Clinical Forensic Medical Consultation report just states the size of each gunshot wound (Dkt. 59-1 at 107).

Defendants are correct. The designated evidence does not show that Officer Isom used excessive force in Sowders' arrest. The evidence supports the fact that Officer Isom did not shoot Sowders. Sowders changed his story multiple times in his deposition as to how he was shot in his left shoulder. Sowders originally claimed he was shot while standing near his car. However, when shown the video evidence disproving that claim, Sowders claimed he was shot while running away

from the officers and claimed that he never faced the officers until after he was shot and rounded the corner of 1405 East Market Street, despite acknowledging that his shoulder wound was a front/side entry wound. Further, Sowders acknowledges that he never saw Officer Isom shoot him.

Sowders' only evidence corroborating his claim against Officer Isom is that the three bullet wounds he suffered were different sizes. But this evidence does not indicate the caliber of the bullet. Indeed, even if the Court were to accept Sowders' version of events, only two calibers of bullets could have been fired at Sowders—Officer Isom's handgun and Corporal Byrne's rifle. If the size of a gunshot wound were directly tied to the caliber of the bullet, then Sowders would have sustained at least two wounds of the same size, but all three gunshot wounds were different sizes. *Id.*

Finally, Officer Isom testified that he never fired his weapon, and both the Indiana State Police's on-scene ammunition check and Forensic Report corroborate his testimony. The designated evidence shows that all seven of the 40 caliber bullets found at the scene matched the handgun Sowders was carrying (Dkt. 54-9 at 4).

The Seventh Circuit has held that conclusory allegations alone cannot defeat a motion for summary judgment. *Dorsey*, 507 F.3d at 627; *see also Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892–93 (7th Cir. 2003); *Igasaki v. Ill. Dep't of Fin. & Prof'l Regul.*, 988 F.3d 948, 956 (7th Cir. 1995). Additionally, unsupported speculation "does not meet a party's burden of producing some defense to a summary judgment motion." *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931–32 (7th Cir. 1995). Speculation by a party "does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Id.* at 932 (emphasis in original).

Sowders' speculation that he was shot by a handgun and therefore it must have been either Officer Isom or Sergeant Brown who shot him is not enough to create a triable issue of fact in the face of the overwhelming evidence to the contrary. Based on the designated evidence, a reasonable jury could not find that Sergeant Brown used excessive force in Sowders' arrest. Summary judgment is **granted** as to the claims against Officer Isom.

**3. Corporal Byrne**

Corporal Byrne admits to using force when he fired his firearm. The Defendants contend that the record demonstrates Sowders fired his weapon at the officers first, and because of that, Corporal Byrne's use of force was objectively reasonable (Dkt. 53 at 18). The Defendants point out that Sowders does not dispute that the five initial shots were from a handgun and thus could have only come from Sergeant Brown's, Officer Isom's, or Sowders' weapon. The evidence is clear that Sergeant Brown and Officer Isom never fired their weapons, leaving Sowders as the only plausible source of the initial gunfire.

The Defendants also note that Corporal Byrne and Officer Isom both testified that Sowders fired his handgun at Corporal Byrne before either of the officers discharged their firearms. Corporal Byrne testified that he did not return fire until after he was struck and fell to the ground. The Defendants further point out that the Forensic Report establishes that the seven 40 caliber shell casings recovered at the scene came from Sowders' weapon. The Defendants assert that Sowders has offered no evidence to refute these arguments, and as such, no genuine issue of material fact remains as to whether Sowders was the initial aggressor. *Id.*

Sowders' responds that Corporal Byrne must have shot him first because body cam would have caught it if Sowders had shot first (Dkt. 59 at 4). This speculation is not enough to defeat the overwhelming evidence that Sowders was the initial aggressor, leaving only the issue of whether

Corporal Byrne used excessive force by returning fire after Sowders—an armed and dangerous individual who had already shot at a civilian's car—fired his weapon at and hit Corporal Byrne multiple times.

The designated evidence shows that the force Corporal Byrne used was objectively reasonable under clearly established precedent governing the use of deadly force in the act of self-defense. The Seventh Circuit has held that "a police officer may constitutionally use deadly force to defend himself and others in certain situations." *Horton v. Pobjecky*, 883 F.3d 941, 949 (7th Cir. 2018). "It is clear that, when an individual threatens a police officer with a deadly weapon, the officer is permitted to use deadly force in self-defense if the use is consistent with the principles set forth in *Tennessee v. Garner*." *Id.* (quoting *Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003)). "When an officer reasonably believes an assailant's actions place 'him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force.'" *Id.* (quoting *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988)).

As previously stated, the Fourth Amendment's "reasonableness" test is "not capable of precise definition or mechanical application." *Graham*, 490 U.S. at 396 (citation modified). "'[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Taylor*, 10 F.4th at 806 (quoting *Graham*, 490 U.S. at 397) (alteration in original). "Such an analysis is inherently fact-dependent, requiring consideration of such factors as the severity of the crime at issue, whether the person posed an immediate threat to the safety of the officers or others, and whether the person was actively resisting the officers." *Williams*, 797 F.3d at 472–73 (citing *Graham*, 490 U.S. at 396).

Applying the above case law and the factors of the Fourth Amendment's reasonableness test, the Court finds that Corporal Byrne reasonably used deadly force. Corporal Byrne was aware that Sowders was suspected of attempted murder for shooting at Toman's car. When Corporal Byrne approached the building, he observed Sowders run. Sowders then emerged from the corner of the building and fired multiple shots at Corporal Byrne, striking him twice in the femoral nerve, which caused him to fall to the ground. While on the ground Corporal Byrne fired several rounds from his rifle in Sowders' direction, and he attests that he did not fire his weapon until after Sowders fired at him and shot him twice.

Corporal Byrne's version of what occurred is corroborated by the designated evidence, such as the bullet hole in Toman's vehicle and by Sowders' own admission that he had shot at her. Sowders admits that he threatened to kill Toman in broad daylight and that he ran from and shot at officers when they showed up to arrest him. In Sowders' own words, he was culpable because he "messed up" by unlawfully shooting at Toman and officers would not have been involved had he not done so (Dkt. 54-5 at 51:9–20), and because he should have gotten on the ground when ordered to do so. *Id.* at 54:20–55:2. Sowders concedes, and the video footage confirms, that he actively resisted officers' orders. In addition, Sowders admits that he was armed and that the officers knew he was armed because they stated, "gun in shorts," when they arrived at the scene.

Seventh Circuit precedent is full of similar cases holding that officers who use deadly force in self-defense or to protect others do not violate the Fourth Amendment. *See Horton*, 883 F.3d at 949; *see also Plakas v. Drinksi*, 19 F.3d 1143, 1150 (7th Cir. 1994) (holding officer's use of deadly force was reasonable when the suspect charged at the officer with a fireplace poker); *Muhammed v. City of Chicago*, 316 F.3d 680, 684–85 (7th Cir. 2002) (holding an officer's use of deadly force was not unconstitutional as the suspect pointed a gun at officers). Accordingly, Corporal Byrne's

use of force was reasonable and did not violate the Fourth Amendment. Summary judgment is therefore **granted** as to the claims against Corporal Byrne.

**B. <u>Qualified Immunity</u>**

Defendants assert that even if an issue of material fact existed regarding whether they violated Sowders' constitutional rights, they are entitled to qualified immunity as they did not violate any clearly established Constitutional right (Dkt. 53 at 25).

"[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "To overcome the defendant's invocation of qualified immunity, [a plaintiff] must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013).

Here, the Court need look no further than the first element—whether the facts make out a constitutional violation—as it is dispositive. The Court found above that the officers' conduct did not amount to a constitutional violation. None of the Defendants used excessive force during the arrest of Sowders. All force used was objectively reasonable given the circumstances. Consequently, Sowders' claims fail to overcome the Defendants' invocation of qualified immunity on the first element. Sowders' claims against the Defendants therefore fail, and Defendants' Motion for Summary Judgment is **granted**.

## IV. <u>CONCLUSION</u>

The majority of Sowders' designated evidence is blatantly contradicted by the record, such that no reasonable jury could believe it, and the Court need not adopt that version of the facts for

purposes of ruling on a motion for summary judgment. Moreover, the Defendants are entitled to qualified immunity. For the reasons discussed above, the Defendants' Motion for Summary Judgment (Dkt. 51) is **GRANTED**. Sowders' § 1983 claims for violations of his Fourth and Fourteenth Amendment rights are **dismissed with prejudice**.

Final Judgment shall issue separately.

**SO ORDERED**.

Date: 9/29/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

BARRY JUNIOR SOWDERS
300148
MIAMI - CF
MIAMI CORRECTIONAL FACILITY
Inmate Mail/Parcels
3038 West 850 South
Bunker Hill, IN 46914-9810

R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP (New Albany)
jlowe@k-glaw.com